UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WILLIE BRIGHT,

                    Plaintiff,

        -against-

ANTHONY J. ANNUCCI, *et al.*,

                    Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/28/2021

No. 18-cv-11111 (NSR)
**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

On November 28, 2018, Plaintiff Willie Bright ("Plaintiff"), proceeding pro se, initiated this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against numerous employees of the New York State Department of Corrections and Community Supervision ("DOCCS") and a private physician arising from repeated brutal sexual assaults by correctional officers, deprivations of medical care, and retaliations against him over the course of one year.  (ECF No. 2.)  On July 25, 2019, Plaintiff filed an Amended Complaint asserting, in sum, claims pursuant to Section 1983 for: (1) excessive force, (2) deliberate indifference to medical needs, (3) retaliation, and (4) failure to protect.  (Amended Complaint ("Am. Compl.") (ECF No. 57).)  Plaintiff also nominally asserts claims for violations of the Prison Rape Elimination Act ("PREA").  (*Id.*)  He asserts some or all of these claims against approximately 21 DOCCS employees, *i.e.*, Anthony J. Annucci ("Annucci"), Thomas Griffin ("Griffin"), Donald Wilkins ("Wilkins"), Sergeant M. Blot ("Blot"), Dr. Karuchee ("Karuchee"), Officer R. Kelly ("Kelly"), Officer CJ Dillon ("Dillon"), Officer Roggers ("Roggers"), Sergeant Johanni ("Johanni"), Officer Freeman ("Freeman"), OSI Inspector H. Pharr ("Pharr"), OSI Deputy Chief Y. Urracia ("Urracia"), Dr. Bentivegna ("Bentivegna"), Colleen Gleason ("Gleason"), Yitzchak Sudranski ("Sudranski"), C.O. Ersan Kahyaoglu

("Kahyaoglu"), Susanne Roessel ("Roessel"), Adam Barter ("Barter"), Irma Russo ("Russo"), Charlene Cody ("Cody"), and Lieutenant Orazio Bucolo ("Bucolo") (collectively, the "DOCCS Defendants").  Plaintiff also asserts a claim for deliberate indifference to medical needs as against private physician Dr. Anthony Ruvo ("Dr. Ruvo").

Presently before the Court is DOCCS Defendants' motion to partially dismiss the Amended Complaint and Dr. Ruvo's motion to dismiss the Amended Complaint.  (*See* DOCCS Defendants' Motion to Dismiss (ECF No. 107); Dr. Ruvo's Motion to Dismiss (ECF No. 104).)  DOCCS Defendants do not move to dismiss the Eighth Amendment excessive force claim against Defendants Blot, Kelly, Roggers, Johanni, and Freemen, the deliberate indifference to medical needs claim against Defendant Barter, or the First Amendment retaliation claim against Defendants Blot, Karuchee, Gleason, and Kahyaoglu.  Instead, they seek dismissal of: (1) any purported private cause of action pursuant to PREA, (2) deliberate indifference to medical needs claims against Defendants Blot, Sudranski, Kahyaoglu, Gleason, Karuchee, Bucolo, Roessel, and Bentivegna, (3) any official capacity claims, (4) any claims against Defendant Russo, (5) any claims against Defendant Annuccci based upon his lack of personal involvement, and (6) failure to protect claims against Defendants Annucci, Griffin, Wilkins, Russo, Urracia, and Pharr. Defendant Ruvo seeks dismissal of any deliberate indifference to medical needs claim asserted against him on the grounds that he is not a state actor.

DOCCS Defendants submitted their memorandum of law in support of their motion to partially dismiss the Amended Complaint ("DOCCS Mem." (ECF No. 108)) and reply memorandum in further support of their motion ("DOCCS Reply" (ECF No. 109)).  Dr. Ruvo submitted a memorandum in support of his motion to dismiss ("Dr. Ruvo Mem." (ECF No. 104-2)) and reply memorandum in further support of his motion ("Dr. Ruvo Reply" (ECF No. 106)).

Plaintiff opposed both motions through the filing of an omnibus opposition memorandum.  (*See* Memorandum of Law in Opposition to Defendants' Motions to Dismiss ("Pl's Opp.") (ECF No. 105).)

 For the following reasons, Dr. Ruvo's motion is GRANTED and DOCCS Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts are derived from the Amended Complaint or matters of which the Court may take judicial notice, are taken as true, and construed in the light most favorable to *pro se* Plaintiff for the purposes of this motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016).

Plaintiff is an inmate currently incarcerated at Clinton Correctional Facility.  The events of this litigation arise out of several shocking violent incidents that allegedly occurred between 2015 and 2016 at Green Haven Correctional Facility ("Green Haven") including, among other things, the repeated anal assault of Plaintiff by correctional officers, threats to murder or further rape Plaintiff made by correctional officers in order to scare him into recanting adverse testimony in a separate case brought against correctional officers, verbal abuse directed at Plaintiff regarding his sexual preferences, and repeated denials or delays of medical treatment for profuse anal bleeding and the presence of foreign objects in his rectum that eventually necessitated surgical extraction and resulted in permanent injuries.

Sometime before the alleged incidents of rape and sexual assault, Plaintiff provided testimony in a lawsuit against certain correctional officers in support of another inmate.  (Am. Compl. at 9.)  As discussed further below, DOCCS Defendants allegedly engaged in extreme and violent measures to attempt to compel Plaintiff to recant his testimony.

3

## I.     The December 29, 2015 Sexual Assault

On December 29, 2015, Plaintiff was placed in a prison suicide intervention room at Green Haven, found a ripped sheet that had been deliberately placed there by unidentified prison officials, and attempted suicide by hanging with the ripped sheet which he fashioned as a noose.  (*Id.* 6-7.) Meanwhile, Defendant Blot and other unidentified correctional officers watched Plaintiff's suicide attempt and laughed.  (*Id.* at 8.)  The noose snapped, Plaintiff fell to the ground, and Officer Blot entered the room, placed Plaintiff in metal mechanical restraints, cut the sheet from around his neck, stripped Plaintiff of his body wrap, flipped Plaintiff onto his stomach, and sat on Plaintiff's lower back.  (*Id.*)

After restraining Plaintiff, Blot proceeded to digitally penetrate Plaintiff's anus (inserting his entire hand) so forcefully that Plaintiff screamed in agony, began to experience extensive internal bleeding from his rectum, and noticed blood fall down his testicles.  (*Id.* at 9.)  Blot then told Plaintiff that he should retract his aforementioned testimony against certain prison officials and keep quiet about the current incident or he would personally see to it that Plaintiff would be subjected to even worse sexual harassment.  (*Id.*)  Subsequently, Blot removed the blood-soaked mattress, sheet, and body wrap from the room, and attempted to mop up the blood on the floor before leaving and locking Plaintiff in the room.  (*Id.* at 10.)

Afterwards, non-party Nurse Barett arrived outside of Plaintiff's room, noticed that his mattress, sheets, and clothes were missing, and inquired about their whereabouts.  (*Id.* at 12.) Plaintiff recounted his suicide attempt and the sexual assault and requested that Nurse Barett take steps to make sure that any remaining evidence was preserved for an investigation.  (*Id.*)  Plaintiff also requested to be sent to an outside hospital.  (*Id.* at 13.)  Nurse Barett sent Plaintiff to the prison clinic to let the prison clinicians determine whether Plaintiff needed outside medical treatment. (*Id.*)  Nurse Barett also advised him that he assumed prison officials would notify the Office of

Special Investigations ("OSI") tonight and recommended that Plaintiff inform the medical staff if he wished to speak with law enforcement about pressing charges.  (*Id.*)

When Plaintiff arrived at the prison clinic, he described the sexual assault to an unnamed doctor, the doctor visually inspected Plaintiff's rectum, took a close look at his injuries, determined that Plaintiff should be sent to an outside hospital for medical treatment, and memorialized his observation that Plaintiff had rectal trauma.  (*Id.* at 14.)  Separately, dried blood was identified in his room as reflected in Plaintiff's ambulatory medical report (which is mentioned in, but not attached to, the Amended Complaint).

While Plaintiff was awaiting transportation to the outside medical provider, Defendant Blot told Defendants Sudranski and Kahyaoglu (the officers that were going to transport Plaintiff) that he attempted to "convince the watch command[e]r not to give this homo piece of shit medical security clearance for this trip, but that fucken [sic] Nurse Barett is threatening to call State Police if we don't send him out, so we gotta send him out, but we did the next best thing[,] we notified a friend at the hospital[,] and the Doctor [*i.e.*, Defendant Dr. Ruvo] who will be assigned to him will be waiting outside when you guys get there[.]  [H]e's a good friend of the Department and has already been told what to do to make this all go away."  (*Id.* at 15.)  Blot further stated that "there will be no PREA examination for this homo who like to rat on correctional officers in law suits and no state police" and that Dr. Ruvo "work[s] for us" and would "say what we tell [him]."  (*Id.*)  Blot also instructed Officers Sudranski and Kahyaoglu to "do whatever you need to do to keep [Plaintiff's] mouth closed out there."  (*Id.*)

When Plaintiff arrived at Mount Vernon Hospital Dr. Ruvo was waiting outside of the hospital and waved at the prison van.  (*Id.* at 16.)  Plaintiff advised Dr. Ruvo that he'd been "raped and [that he was] injured and still bleeding from [his] rectum and [that he was] in great pain [and

that he needed] treatment and to be seen by a PREA sexual assault examiner." (*Id.*)  Dr. Ruvo advised Plaintiff that he was only performing a lower body x-ray examination and that he could report any sexual related injuries to prison medical staff once he was sent back to the prison before laughing with the transporting correctional officers.  (*Id.*)  After Plaintiff suggested that they interfered with his ability to obtain medical treatment, the two officers and the doctor laughed and assured each other that "they got away with this all of the time and [Plaintiff's] situation would be no different." (*Id.* at 16-17.)  Defendant Kahyaoglu then went on an extended monologue in which he called Plaintiff a "stupid homo" with "dick sucking lips," warned him not to mention anything to anyone in the hospital about wanting to speak to law enforcement or pressing charges, and advised Plaintiff that he could easily murder him and get away with it by fabricating a report about Plaintiff attempting to escape from the transport van.  (*Id.* at 17.)  Plaintiff, fearing for his life, did not press the issue of getting a rape-kit any further.  (*Id.*)

After returning to Green Haven, Plaintiff was interviewed by Defendants Karuchee and Gleason.  (*Id.* at 19.)  He advised them that he was physically suffering, in danger, and that he wanted to speak with OSI and law enforcement to report the sexual assault he experienced at the hands of Blot.  (*Id.* at 19-20.)  Gleason responded that they were "not going to call [his] medical care provider, OSI or anyone else because [they] are well aware of everything going on with [him] at this prison," that he was "the top topic in all of [their] treatment meetings with Deputy Wilkins and Superintendent Griffin," that reporting him would "jeopardize [their] jobs," that Plaintiff was "personally responsible for initiating all of these problems on [himself] by agreeing to be a eye witness against prison officers," and that Plaintiff could make the troubles disappear by recanting his testimony.  (*Id.* at 21-22.)  Karuchee nodded along in agreement with Gleason's statements, belittled Plaintiff's prior grievances against her, referred to Plaintiff as a "homo," advised him that

homosexuals (like Plaintiff) "are the worst sickness this world knows," belittled Plaintiff's attempts to seek support from LGBTQIA+ advocacy organizations, advised him that he would be medically cleared so that he could return to his cell and recant his testimony, and encouraged him to do a better job at killing himself next time he attempts suicide.  (*Id.* at 22-23.)

## II.   Subsequent Reporting of the December 29, 2015 Sexual Assault and Plaintiff's Attempt to Transfer to Another Correctional Facility

Sometime soon after the events of December 29, 2015, Plaintiff's family was prevented from visiting him, and the family members raised this issue with Defendant Annucci.  (*Id.* at 25.) Defendant Annucci advised them that he would investigate the matter, that Plaintiff had already come to his personal attention because he understood that Plaintiff had been on a hunger strike at Green Haven, and that, if necessary, DOCCS would have to force feed Plaintiff.  (*Id.* at 25-26.) Plaintiff makes a few contradictory allegations relating to Annucci's role in ensuring Plaintiff's security immediately after the December 29, 2015 assault.  On the one hand, Plaintiff first alleges that Annucci never investigated the matter.  (*Id.* at 26-27.)  Later on in the Amended Complaint, Plaintiff contradicts this allegation by hypothesizing that "maybe Commissioner [Annucci] did come to Green Haven to investigate the severe hunger strike and was made aware that his employees were completely out of compliance with PREA, and DOCCS sexual abuse report protocol and simply failed to order officials to send me back to the outside hospital out of deliberate indifference to my health and personal safety."  (*Id.* at 27.)

Eventually, Annucci advised the family members that Plaintiff was no longer engaging in a hunger strike and lied to them that he was not strong enough for a family visit.  (*Id.* at 27.) Plaintiff blames Annucci for failing to order officials to send him back for further outside medical treatment and that "inspite of having knowledge that no OSI investigation had been opened in this matter [Annucci] personally held none of his employees accountable for failing to notify OSI in

compliance with DOCCS zero tolerance sexual abuse policy." (*Id.* at 28.)  This failure to report Plaintiff's sexual assault is alleged to have resulted in Plaintiff being sexually assaulted a second time in Green Haven. (*Id.*)

Sometime after attempting to induce Plaintiff into recanting his testimony, likely in or around February 2016, Karuchee and Gleason medically cleared Plaintiff and he was sent back to his cell in Green Haven. (*Id.* at 28.)  Back in his cell, Plaintiff immediately attempted suicide and had to be rushed back to the residential crisis treatment program ("RTCP") (an acute mental health observation unit). (*Id.* at 29.)  There was no RCTP rooms available at Green Haven, so Plaintiff was sent to Downstate Correctional Facility ("Downstate") where there were available RCTP rooms at that time. (*Id.*)  Plaintiff informed officers at Downstate that he had been sexually assaulted at Green Haven and that officers at Green Haven failed to conduct an investigation into the assault. (*Id.*)  Unidentified Downstate Correctional Officers are alleged to have complied with their PREA protocols by contacting OSI and reporting the incident. (*Id.* at 25, 30.)  Downstate officials also obtained unspecified medical treatment for Plaintiff and arranged for OSI and PREA officials to speak with him. (*Id.* at 30.)

Defendant Russo, an OSI inspector, was sent to Downstate and opened an official OSI investigation into the matter. (*Id.* at 25.)  Plaintiff gave Russo an extensive report describing the events of December 29, 2015 and pointed her to potential leads (*e.g.*, Nurse Barett). (*Id.* at 30.)  Russo assured Plaintiff that she would speak to all witnesses, find out why officials had failed to notify OSI about this matter before his transfer to Downstate, and raise this matter with her supervisor Defendant Urracia because Plaintiff's "life was in obvious danger if they were all working this hard to cover this attack up." (*Id.* at 31.)  Soon afterwards, Plaintiff was sent back to

8

Green Haven, his family was allowed to visit him there, and Plaintiff told them about the December 29, 2015 sexual assault. (*Id.*)

Plaintiff and his family then "began a campaign to Commissioner Annucci" attempting to persuade him "to move [Plaintiff] to another prison location" in light of safety concerns at Green Haven. (*Id.* at 31-32.) Plaintiff alleges that, at that point, "Annucci had first hand knowledge that all departmental protocol in responding to a PREA sexual assault had been violated by his employees and a possible cover up was now being investigate[d] and on these facts alone [Plaintiff] should [have] been moved to another [correctional facility]." (*Id.* at 32.) He also alleges that Annucci had first hand knowledge that "no medical treatment had been allowed until I agreed to no longer be a[n] eye witness" and that Plaintiff's "physical safety [was] threatened" and that his "medical and [mental] health was in danger." (*Id.*) Rather than move Plaintiff to a different facility, Annucci "assur[ed] [Plaintiff] and [his] family [ ] that OSI was involved, [Plaintiff] would be safe at Green Haven, and [Annucci] would be personally holding all officials accountable who failed to notify OSI about this matter." (*Id.*) Annucci is further alleged to have given his "personal assurance that all PREA protocol and standards would be strictly enforced and followed . . . but this never happen[ed]" and as a result Plaintiff was "sexually assaulted for a second time in Green Haven." (*Id.* at 33.) Finally, Plaintiff alleges that he had "made Commissioner Annucci and others specifically aware of [Officer Blot's] threats" (*i.e.*, that Plaintiff would be subjected to further sexual violence and humiliation by correctional officers at Green Haven if he did not recant his testimony). (*Id.*)

## III.    The February 28, 2016 Sexual Assault

In the weeks prior to February 28, 2016, Green Haven staff constantly threatened Plaintiff in order to induce him into recanting his testimony and, through misconduct or otherwise, Plaintiff deliberately acted in a manner that caused DOCCS to place him in keeplock confinement – *i.e.*,

separated from general population and confined to his cell for a significant period of time.  (*Id.* at 34.)  While in keeplock, Plaintiff continued directing requests to Annucci to transfer him to a different correctional facility, and Annucci continued denying these requests.  (*Id.*)  He also sent Annucci grievances concerning the actions of unidentified correctional officers that withheld food sent by Plaintiff's family in order to force him to recant his testimony.  (*Id.*)

On February 28, 2016, Defendants Kelly and Roggers escorted Plaintiff from his keeplock cell to Green Haven's medication distribution location, realized that Plaintiff "was . . . the little homo that Officer Blot had been talking about," and warned him that he was "about to find out the hard way [that] OSI and DOCCS are coworkers against inmates, especially gay ones like [Plaintiff]."  (*Id.* at 35.)  Later that day, Roggers and Dillon rushed into Plaintiff's cell, punched Plaintiff in the face (resulting in a loose tooth and black-eye), pushed Plaintiff on the bed, and used arm restraints to immobilize Plaintiff even though he "wasn't resisting them at all."  (*Id.* at 36.)  After he was immobilized, Kelly came into the cell, stripped Plaintiff naked, "viciously forced two foreign objects [later revealed to be a battery and an obsolete thermometer] into [Plaintiff's] rectum," shouted that Plaintiff was "a disgusting homo rat," and hinted at a symbolic meaning to the foreign objects by stating that he was "giving [Plaintiff] some new energy and taking [Plaintiff's] temperature." (*Id.*)  Plaintiff's preexisting rectal injuries were aggravated causing him extreme pain and bleeding.  (*Id.*)  Noticing the bleeding, Roggers used racially-charged language to describe Plaintiff, and threatened to kill Plaintiff if he bled on the three officers.  (*Id.*)  Plaintiff cried out for help and the three officers mocked Plaintiff and told him to choose between further sexual degradation and recanting his testimony.  (*Id.* at 37.)  Plaintiff agreed that he would not testify against any corrections officers.  (*Id.*)

Afterwards, Plaintiff's cell was covered in "so much blood" and Plaintiff experienced "indescribable pain" as the foreign objects were lodged "deep in [his] rectum." (*Id.*)  DOCCS personnel eventually noticed Plaintiff's suffering and initially called for a medical team and OSI staff.  However, when Plaintiff advised Defendant Bucolo that he had been attacked by DOCCS officers, Bucolo called off the medical team and OSI staff, called for janitorial staff to clean up the blood to conceal evidence from OSI, and ordered others to evacuate Plaintiff to the Office of Mental Health ("OMH") so that no evidence would be memorialized about the assault and he would be deprived of medical treatment.  (*Id.* at 38.)  Bucolo advised Plaintiff that he realized Plaintiff needed medical attention but that he was directed to cover up the incident by Defendants Griffin and Wilkins and to deny Plaintiff medical attention unless he was willing to accuse other inmates of assaulting him.  (*Id.* at 38-39.)

As Plaintiff was being escorted to the OMH, he spoke to Roessel and advised her that he was not suicidal or otherwise in need of mental health services, and requested medical treatment (preferably from an outside hospital) to attend to rectal injuries and the presence of two foreign objects lodged in his rectum.  (*Id.* at 39-40.)  Despite Plaintiff's statements and his apparent need for medical attention to dislodge the painful objects in his rectum, Roessel admitted Plaintiff to the RTCP and sent him to a strip room where he painfully expelled a battery from his rectum without any medical assistance.  (*Id.* at 40.)  After expelling the battery, Plaintiff was forced to stand the rest of the night with the thermometer still lodged in his rectum.  (*Id.* at 41.)

The following day, at 4 p.m., Russo found Plaintiff in a room covered in his own blood and inquired about what had occurred.  (*Id.* at 43.)  Plaintiff extensively recounted the events of the prior night and requested that Russo photograph his rectum to help preserve evidence.  (*Id.*)  Russo stated that she could not take pictures of his rectum because Defendant Urracia prohibited her from

taking photographs of Plaintiff. (*Id.*) Upon learning that a second foreign object remained lodged in Plaintiff's rectum and that Plaintiff was in pain, Russo ordered officials to send Plaintiff to an outside hospital for further medical treatment. (*Id.* at 44.) At the hospital, Plaintiff was admitted and a surgeon performed a rectal surgery to extract the foreign object which was then revealed to be a thermometer. (*Id.*) After the surgery, Plaintiff advised the surgeon that the thermometer had been forcibly inserted into his rectum by three corrections officers and the surgeon called State Police (it is unclear whether Plaintiff interacted with the police). (*Id.*) Plaintiff also went over his account of the events with Russo once more and she advised him that she was going to Defendants Annucci and Urracia to arrange for a personal safety video order and to see if she could have him moved to a different correctional facility. (*Id.* at 44-45.)

## IV. Plaintiff Learns About Wide-Reaching Conspiracy to Suppress His Testimony and Then Attempts Suicide

Sometime after the February 28, 2016 assault, Plaintiff resolved to recant his testimony to avoid future assaults, told the attorney representing the non-party inmate that he would no longer testify on that inmate's behalf, and advised unidentified DOCCS officials that he was no longer serving as an adverse witness. (*Id.* at 45.) Subsequently, Defendant Russo was removed from OSI Investigations and began working as an ordinary sergeant instead. (*Id.* at 46.)

Unsolicited, Defendant Russo informed Plaintiff that there was a conspiracy to suppress his testimony through, if necessary, assault and depriving him of medical attention, and that this coordinated harassment was known of and approved by high ranking DOCCS officials. According to Inspector Russo, Plaintiff had made the wrong enemies by agreeing to testify as an adverse witness against a correctional officer that was related by marriage to Defendant Griffin and an unidentified person in the "Commissioner's Department in Albany." (*Id.*) As a result, "there was a [sic] actual contract employee promotion on me"—though somewhat unclear, the Court

12

understands this to suggest that there was an unofficial incentive among correctional officers to antagonize Plaintiff—and "this is why Commissioner Annucci was deliberately refusing to transfer[] me to [a] safer prison location" even though Annucci knew that Plaintiff "had been attack[ed] twice at Green Haven Prison." (*Id.*) Russo also suggested that Plaintiff could sue DOCCS if he was not moved to another correctional facility and told him that Defendant Urracia was aware of the "employee contract on [Plaintiff]" and, in tacit agreement with the conduct, refused to "allow her to take pictures, speak to [Plaintiff's] witnesses, or hold prison official accountable." (*Id.* at 47.)

Even though Plaintiff had agreed to no longer testify against well-connected DOCCS officers, correctional officers continued to threaten him. (*Id.* at 49.) In an attempt to handle the aforementioned traumatic experiences, Plaintiff sought assistance from OMH officials and advised them that he was experiencing suicidal ideation. (*Id.*) To this end, while Plaintiff was assigned to RTCP, he advised OMH employee Barter that he was contemplating suicide, that he had "been raped twice" at Green Haven, and that he was still being harassed by DOCCS officials. (*Id.*) Despite these representations, Barter stated that Plaintiff was being discharged out of RTCP and that Plaintiff's "black life doesn't matter." (*Id.* at 49-50.) Despite Plaintiff's protests that he should remain in RTCP because he was suicidal, an unnamed officer advised him that Annucci had ordered that Plaintiff be returned to general population through his chain of command. (*Id.* at 50.) Subsequently, Griffin and Wilkins personally visited Plaintiff and told him that he was to be moved to his cell despite his suicidal ideation and that "the Commissioner [Annucci] had said to move you by force to take you back to your cell." (*Id.* at 51.)

Plaintiff was subsequently transferred to a special-housing-unit ("SHU") cell where he once again attempted suicide by hanging and had to be cut down by correctional officers. (*Id.*)

Plaintiff attempted suicide was made known to Defendants Urracia and Pharr—Russo's replacement at OSI—and Pharr advised Plaintiff that he could not make an official report because his suicide attempt was not a sexual assault.  (*Id.* at 52.)  In despair, Plaintiff unsuccessfully attempted suicide again on multiple subsequent occasions.  (*Id.*)

Eventually, in or around April 2016, OMH officials sent Plaintiff to an outside mental hospital.  (*Id.*)  While located at the hospital, Plaintiff and his family petitioned Annucci to relocate Plaintiff to a different correctional facility.  (*Id.*)  The request was denied and Plaintiff was sent back to Green Haven, where he would be sexually assaulted for a third time several months later.

## V.   The September 5, 2016 Rape

Between April 2016 and September 2016, Plaintiff spent the majority of his time in RCPT at Green Haven and was assigned to an isolation area due to overcrowding.  (*Id.* at 53.)  On September 5, 2016, Plaintiff was aroused from his slumber by loud voices arguing outside his room.  (*Id.*)  Defendant Johanni and a nurse, subsequently identified as Defendant Cody, were arguing with respect to Johanni's attempts to enter Plaintiff's room in a manner that did not conform to the ongoing safety video order.  (*Id.*)  Despite Plaintiff's attempts to convince Cody to either prevent Johanni from entering or to seek help, Cody eventually permitted Johanni to enter Plaintiff's room without video surveillance.  (*Id.*)  Cody allegedly realized Plaintiff was endangered but did not seek help.  (*Id.*)

Johanni entered Plaintiff's room along with Defendant Freeman—a correctional officer with an alleged history of violence against inmates and sexual aggression against female co-workers—and proceeded to punch Plaintiff in the face.  (*Id.* at 54.)  After pummeling Plaintiff, Freeman used a chokehold to restrain Plaintiff and removed Plaintiff's pants.  (*Id.*)  With Plaintiff's buttocks exposed, Freeman violently raped Plaintiff through penile-anal penetration and Johanni stood by the door as a lookout while shouting racially-charged terms of encouragement.  (*Id.*)

14

Plaintiff yelled for Freeman to stop raping him, but Freeman instead choked him and speculated that Plaintiff, being a homosexual, must have enjoyed the experience.  (*Id.*)  Concerned about onlookers, Johanni suggested that Freeman should finish up.  (*Id.*)  Freeman "raped [Plaintiff] a little while longer," mused that Plaintiff "loved the dick," and then proceeded to force a "metal object . . . into [Plaintiff's] rectum" which caused Plaintiff to yell in pain.  (*Id.* at 55.)

Plaintiff waited in shame and pain for several hours with the metal object digging into his "rectum walls" until a different set of correctional officers would start their shift so that he could obtain treatment without fear of reprisal.  (*Id.*)  When a new shift of correctional officers arrived, Plaintiff promptly made an official medical report of rape and assault to Nurse Cody and pointed to the blood in his room as corroborating evidence.  (*Id.*)  Nurse Cody took his vitals, asked if he had taken his medication, and advised him that she could not help.  (*Id.* at 56.)

The following day, Pharr visited Plaintiff, refused to view video-footage that might corroborate the alleged rape, and asked Plaintiff to tell him what he thought occurred.  (*Id.* at 57.)  Plaintiff recounted the rape, told Pharr that a metal object remained lodged in his rectum proving that he was raped, and stated that he needed immediate medical treatment.  (*Id.*)  Pharr expressed incredulity at Plaintiff's account given the restrictions in place and video order, and went to check the previous day's video recordings to confirm the veracity of Plaintiff's account.  (*Id.* at 58.)  Pharr, in a seemingly unprovoked moment of honesty, confessed to Plaintiff that there was no video recording available for the time that he was allegedly raped (suggesting that it had been destroyed or inappropriately never recorded), and advised Plaintiff that, pursuant to directions from Urracia, he would fabricate a misbehavior report that would exculpate the alleged rapists and cast doubt on Plaintiff's allegations.  (*Id.* at 59.)

Sometime afterwards, an unidentified nurse noticed Plaintiff's room, called the head physician, Dr. Bentivegna to the room, pointed his attention towards the blood in the room, and advised him that she thought Plaintiff should be sent to an outside hospital. (*Id.* at 60.) Bentivegna refused to get involved because OSI was not independently ordering Plaintiff's admission to an outside hospital. (*Id.* at 60.) Bentivegna further acknowledged that he was not getting Plaintiff a follow up appointment with a rectal specialist physician because "that's just how things work[] around here." (*Id.* at 61.) As a result of Bentivegna's failure to obtain medical treatment for Plaintiff, the metal object remained lodged in Plaintiff's rectum for approximately one week, and Plaintiff suffered permanent damage. (*Id.*)

No further events are detailed in the Amended Complaint after this encounter with Bentivegna in or around September 2016.

## LEGAL STANDARD

### I.   Fed. R. Civ. P. 12(b)(6)

On a Fed. R. Civ. P. 12(b)(6) motion, dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pleaded factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555. A motion to dismiss will be denied where the allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

*Pro se* complaints are to be liberally construed. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). They must be held to less stringent standards than complaints written by lawyers, and only

16

dismissed when the plaintiff can prove "no set of facts in support of his claim which would entitle

him to relief." *Estelle*, 429 U.S at 106 (quoting *Conley v. Gibson*, 335 U.S. 41, 45–46 (1957)).

This "is particularly so when the *pro se* plaintiff alleges that [his] civil rights have been violated."

*Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).  *Pro se* complaints must

be interpreted as raising the strongest claims they suggest, but "must still state a plausible claim

for relief."  *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013).

## II.    42 U.S.C. § 1983 Claims

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any

statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected,

any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be liable to the party injured."  42 U.S.C. § 1983.

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights

elsewhere conferred by those parts of the United States Constitution and federal statutes that it

describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Cornejo v. Bell*, 592 F.3d 121,

127 (2d Cir. 2010).  To state a claim under Section 1983, a plaintiff must allege two essential

elements: "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of

the United States'; and (2) that they did so 'under color of state law.'"  *Giordano v. City of New

York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40,

49–50 (1999)).

## DISCUSSION

Read liberally, Plaintiff is asserting the following Section 1983 claims: (1) deliberate

indifference to medical needs against Dr. Ruvo and certain DOCCS Defendants; (2) failure to

protect claims against certain DOCCS Defendants; (3) violations of PREA against certain DOCCS

Defendants; and (4) certain official capacity claims.  As discussed below the Court: (i) dismisses

claims against Dr. Ruvo for failure to plead that Dr. Ruvo is a state actor; (ii) dismisses deliberate indifference claims against certain DOCCS Defendants but denies DOCCS Defendants' motion to dismiss with respect to deliberate indifference claims asserted against Defendants Griffin, Wilkins, Annucci, Roessel, Bucolo, Bentivegna, and Cody; (iii) dismisses Plaintiff's failure to protect claims against Defendants Wilkins, Griffin, and Pharr and denies DOCCS Defendants' motion with respect to failure to protect claims against Defendants Annucci, Urracia, and Cody; (iv) dismisses all claims against Defendant Russo with prejudice; (v) dismisses all claims predicated upon PREA; and (vi) dismisses any official capacity claims asserted by Plaintiff.

**I.   Whether Defendant Dr. Ruvo Qualifies as a State Actor**

As a threshold matter, the Court dismisses claims against Dr. Ruvo on the grounds that he does not qualify as a state actor for the purposes of Section 1983.  Dr. Ruvo can only be liable pursuant to Section 1983 to the extent that it is appropriate to treat him as a state actor in his provision of medical care to Plaintiff.  Courts have sometimes found non-public medical providers to be state actors when they provide medical care to inmates at a prison facility.  *See, e.g., West v. Atkins*, 487 U.S. 42 (1988).  Likewise, courts have treated non-public medical providers to be state actors when they provide inmates with medical treatment outside of a prison *pursuant to a contract. See, e.g., Rodriguez v. Mount Vernon Hosp.*, No. 09-CV-5691, 2010 WL 3825736, at *4 (S.D.N.Y. Sept. 7, 2010) (determining that the plaintiff's proposed amended complaint would not be futile when it sought punitive damages from an "outside physician who work[ed] for an outside hospital that [DOCCS] ha[d] a contract with to render services to its inmates" because "a doctor may still be considered a state actor as long as the doctor was obligated, even if indirectly, to provide medical services to state inmates" (citations, record citation, and quotation marks omitted)), *adopted by* 2010 WL 3825715 (S.D.N.Y. Sept. 30, 2010), *aff'd*, 2010 WL 3959602 (S.D.N.Y. Oct. 5, 2010); *Garraway v. Artuz*, No. 01-CV-3126, 2002 WL 221584, at *6 (S.D.N.Y.

Feb. 13, 2002) (determining that a private physician was a state actor when his employer was "a party to a contract that require[d] him to provide medical services to prisoners in the State of New York").   However, courts have held that the provision of medical care by a private hospital to an individual in police custody on the same terms as the hospital would provide to the public at large does not satisfy the state action test, *i.e.*, when a private doctor is alleged to provide services for an inmate outside of a correctional facility but there is no allegation that the medical services were provided pursuant to a contract or state compulsion. *See, e.g.*, *Kavazanjian v. Rice*, No. 03–CV1923 (FB), 2008 WL 5340988, at *12 (E.D.N.Y. Dec. 22, 2008) ("Providing isolated emergency treatment to a prisoner on equal terms with the general public ... does not constitute state action.") (citation omitted); *see also Sykes v. McPhillips*, 412 F.Supp.2d 197, 203 (N.D.N.Y. 2006) (inmate hospital not state actor for Section 1983 purposes where it provided medical care to prisoner brought to it by state for emergency medical treatment); *Morse v. City of N.Y.*, No. 00–CV–2528, 2001 WL 968996, at *8 (S.D.N.Y. Aug. 24, 2001) (noting that fact that plaintiff was brought to hospital from police custody insufficient to transform private hospital and staff into state actors for Section 1983 purposes).

Here, Dr. Ruvo is alleged to have treated Plaintiff at a private hospital and there is no allegation that this treatment was provided pursuant to a contract between the government and the private hospital.  The only nexus alleged is that Dr. Ruvo was sympathetic to correctional officers and wished to make their problems go away.  This sort of conclusory allegation that a private doctor was sympathetic to government, but not monetarily incentivized or otherwise captured by government compulsion is insufficient to satisfy the state action test.  Accordingly, Dr. Ruvo's

motion to dismiss is GRANTED.[1]  Claims against Dr. Ruvo are dismissed without prejudice, and Plaintiff is granted leave to amend his complaint to correct deficiencies identified herein.

## II.   Deliberate Indifference to Medical Needs

Deliberate indifference claims are asserted against Dr. Ruvo, Blot, Sudranski, Kahyaoglu, Gleason, Karuchee, Bucolo, Roessel, Bentivegna, Bucolo, Cody, Wilkins, and Griffin in connection with four distinct medical emergencies.  The Court begins with an analysis of the legal framework for such claims and then separately analyzes the sufficiency of pleadings against Defendants arising from: (1) the December 29, 2015 assault and subsequent bleeding, (2) the February 28, 2016 assault and subsequent surgery, (3) Plaintiff's suicide attempts between February and April 2016, and (4) Plaintiff's rape and subsequent bleeding on September 5, 2016. As discussed below, the Court concludes that Plaintiff has failed to plausibly allege deliberate indifference claims against Defendants Blot, Dr. Ruvo, Sudranski, Kahyaoglu, Gleason, and Karuchee with respect to treatment after the December 29, 2015 assault are dismissed without prejudice but that Plaintiff has plausibly alleged deliberate indifference against Defendants Griffin, Wilkins, Annucci, Roessel, Bucolo, Bentivegna, and Cody arising from the events of February 28, 2016 through September 5, 2016.

### A.   Legal Framework of Deliberate Indifference Claims

The Eighth Amendment guarantees freedom from "cruel and unusual punishment."  U.S. Const. amend. VIII.  This includes depriving prisoners of their "basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety."  *Helling v. McKinney*, 509 U.S. 25, 32

---

[1] Plaintiff's deliberate indifference to medical needs claim against Dr. Ruvo is also deficient insofar as he predominately pleads that Dr. Ruvo failed to obtain a rape kit to document indicia of sexual assault rather than Dr. Ruvo's failure to provide appropriate medical treatment. To the extent that Plaintiff further amends his complaint to reassert claims against Dr. Ruvo he should be mindful of this deficiency as well.

(1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Serv.*, 489 U.S. 189, 200 (1989)).  For

a plaintiff to establish that a prison official violated the Eighth Amendment, "(1) the alleged

deprivation must, as an objective matter, be 'sufficiently serious,' [*i.e.*, the 'objective prong'] and

(2) the alleged perpetrator—ordinarily a prison official—must possess a 'sufficiently culpable state

of mind.' [*i.e.*, the 'subjective prong']." *Randle v. Alexander*, 960 F. Supp. 2d 457, 470 (S.D.N.Y.

2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

To determine whether a deprivation of medical care is "sufficiently serious," the Court

must "(1) determine whether the medical care was inadequate, and, (2) if so, '[ ] examine how the

offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely

cause the prisoner.'" *Taft v. Fricke*, No. 9:17-CV-0346 (GTS/CFH), 2019 WL 5197180, at *7

(N.D.N.Y. July 26, 2019) (citing *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. Oct. 27,

2006)).  To assess the adequacy of care a claimant received, the Court must determine whether the

prison official provided "reasonable care."  *Salahuddin*, 467 F.3d at 279.

The next step in determining whether a claimant's deprivation was sufficiently serious

depends on the type of claim they are making.  If the claimant is alleging the prison official failed

to provide any treatment at all, "courts examine whether the inmate's medical condition is

sufficiently serious."  *Id.* at 280.  To establish that a medical condition was "sufficiently serious"

a plaintiff must allege "a condition of urgency, one that may produce death, degeneration, or

extreme pain."  *Coke v. Med., Dep't of Corr. & Cmty. Supervision*, 17 Civ. 0866 (ER), 2018 WL

2041388, at *3 (S.D.N.Y. Apr. 30, 2018)  There are several factors that a court may consider when

deciding whether a medical condition is "sufficiently serious," including "chronic and substantial

pain or the presence of a medical condition that significantly affects an individual's daily

activities." *Salgado v. DuBois*, 17-cv-6040 (NSR), 2019 WL 1409808, at *5 (S.D.N.Y. Mar. 28, 2019).

If the claimant concedes that he received medical treatment but alleges that it was inadequate, "the inquiry is narrower, and the court should focus on the specific inadequacy of the treatment, not the underlying medical condition alone." *Taft*, 2019 WL 5197180, at *7.

For the subjective prong, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety" that would result from his or her act or omission. *Jones v. Avanzato*, No. 14-cv-2044 (NSR), 2016 WL 183565 at *3 (S.D.N.Y. Jan. 13, 2016) (citing *Farmer*, 511 U.S. at 837). Medical malpractice "does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness—'an act or a failure to act by [a] prison doctor that evinces a conscious disregard of a substantial risk of serious harm.'" *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)) (internal quotation marks omitted). Therefore, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

"Although deliberate indifference claims are most often asserted against medical personnel," *Bookman v. Lindstrand*, No. 15-CV-1542, 2018 WL 3121688, at *12 (N.D.N.Y. Feb. 14, 2018), *report and recommendation adopted*, 2018 WL 1470585 (N.D.N.Y. Mar. 26, 2018), "non-medical personnel may [also] be found to have engaged in deliberate indifference," *Haynes v. City of New York*, No. 19-CV-1925, 2020 WL 4926178, at *14 n.28 (S.D.N.Y. Aug. 20, 2020) (citing *Roundtree v. City of New York*, No. 15-CV-8198, 2018 WL 1586473, at *6 (S.D.N.Y. Mar. 28, 2018)). That Plaintiff has accused correctional officers of deliberate indifference does not, however, alter the relevant analysis: "The same standards apply to a claim of deliberate

indifference to serious medical needs on the part of nonmedical prison personnel." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017) (quoting *Hodge v. Coughlin*, No. 92-CV-622, 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994), *aff'd*, 52 F.3d 310 (2d Cir. 1995)); *see also Shepherd v. Fisher*, No. 08-CV-9297, 2017 WL 666213, at *11 (S.D.N.Y. Feb. 16, 2017) (observing that although certain defendants were "not medical personnel," an incarcerated plaintiff's deliberate-indifference claims against them were "nonetheless evaluated under the 'deliberate indifference' framework of the Eighth Amendment"). Courts in this Circuit have frequently observed that to establish a deliberate-indifference claim against nonmedical personnel, "a plaintiff must prove that [the] nonmedical prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problems known to the attendant prison personnel or that the inmate suffered a complete denial of medical treatment." *Haynes*, 2020 WL 4926178, at *14 n.28 (quotation marks and alteration omitted) (quoting *Roundtree*, 2018 WL 1586473, at *6); *Crandell v. Ross*, No. 19-CV-6552, 2020 WL 134576, at *4 (W.D.N.Y. Jan. 13, 2020) (reciting the same standard); *Young v. Choinski*, 15 F. Supp. 3d 194, 200 (D. Conn. 2014) (same). "At a minimum, there must be at least some allegations of a conscious or callous indifference to a prisoner's rights." *Hodge*, 1994 WL 519902, at *11 (citation omitted).

**B.**   *Denial of Appropriate Medical Treatment After the December 29, 2015 Assault*

As discussed above, after Defendant Blot's assault on Plaintiff, he allegedly experienced excruciating pain and profuse bleeding, sufficient to cover a mattress, sheets, and his room, that several defendants failed to treat his pain or bleeding and the only treatment provided was a lower body x-ray. There is little serious dispute that Plaintiff's visible and profuse rectal bleeding constituted a serious medical need. "'[T]he severity of Plaintiff's apparently visible injuries,' including [rectal] bleeding . . . can support an inference of deliberate indifference at this early stage

23

of litigation." *Hernandez v. City of New York*, No. 14-CV-192 (JPO), 2017 WL 2242965, at *5 (S.D.N.Y. May 22, 2017) (quoting *Betts v. Rodriquez*, No. 15-CV-3836 (JPO), 2016 WL 7192088, at *5 (S.D.N.Y. Dec. 12, 2016)); *see also Holness v. Gagne*, No. 3:18-CV-01752 (JAM), 2019 WL 6683058, at *5 (D. Conn. Dec. 6, 2019) ("Holness's alleged swallowing of a sharp blade in May, which resulted in a period of abdominal pain and rectal bleeding, was obviously a serious medical condition that deserved to be treated at the time."); *Petty v. City of New Britain*, 2018 WL 587321, at *3 (D. Conn. 2018) (rectal bleeding is a serious medical need).

Nonetheless, Plaintiff's complaint is largely premised upon the theory that he should have been provided with a rape kit rather than a lower body x-ray. This allegation is insufficient to plead a sufficiently serious *deprivation* of medical care to satisfy the objective prong. A rape kit documenting evidence of Plaintiff's rectal trauma would not have mitigated, treated, or cured Plaintiff's pain or bleeding. It would have hypothetically memorialized the fact that the condition of his rectum was consistent with the condition of a victim of anal rape. While, the alleged conduct of Defendants in attempting to cover up sexual assault is unconscionable to any thinking person, a claim for deliberate indifference does not arise from the allegation that medical providers failed to aid a victim of sexual assault in developing an evidentiary record of their assault. Instead, Plaintiff alleges that he received some treatment (*i.e.*, a lower body x-ray to assess internal injuries), but not the treatment he desired (*i.e.*, a rape kit) even though the treatment he desired would have done nothing to prevent the worsening of his condition or mitigate symptoms he was experiencing at the time. At bottom, Plaintiff's disagreement with the treatment he was provided with is insufficient to allege deliberate indifference because "disagreements among treating medical professionals do not create an inference of deliberate indifference." *Allah v. Switz*, No.

14-CV-5970, 2017 WL 519269, at *7 (S.D.N.Y. Feb. 8, 2017) (collecting cases); *see also McKenna v. Wright*, No. 01-CV-6571, 2002 WL 338375, at *8 (S.D.N.Y. Mar. 4, 2002).

Accordingly, Plaintiff's claim for deliberate indifference to medical needs against Defendants Dr. Ruvo, Blot, Sudranski, Kahyaoglu, Gleason, and Karuchee with respect to his treatment in the aftermath of the December 29, 2015 assault is dismissed. Plaintiff is granted leave to further amend his complaint. Plaintiff may have a cognizable theory of deliberate indifference predicated upon the failure of Defendants to address his internal bleeding or pain but, as of yet, Plaintiff has not alleged sufficient details regarding the pain he experienced or the lack of treatment he experienced relating to his pain (*e.g.*, he has not alleged how long he was denied treatment or how long his pain lasted) to enable this Court to determine that there was a sufficiently serious deprivation of medical care.

## C.    *Delay of Appropriate Medical Treatment after the February 28, 2016 Assault*

By contrast, Plaintiff's deliberate indifference claim against Defendants Roessel, Bucolo, Wilkins, and Griffin in connection with the denial and delay of medical treatment on February 28, 2016 is clearly sufficient to survive a motion to dismiss. As pled, Plaintiff was experiencing profuse bleeding and advised Bucolo and Roessel that he had several foreign objected lodged into his rectum causing extreme pain. (Am. Compl. at 38-42.) The presence of foreign objects within a person's internal organs is a sufficiently serious condition that necessitated medical treatment at that time. *See Cosner v. Dodt*, 526 F. App'x 252, 254 (4th Cir. 2013) (deliberate indifference when prisoner swallowed sharp plastic knife and nurse merely checked his vitals, ordered an x-ray three days later, and only sent him to the hospital when he started to bleed five days later).

While the conduct of Roessel, Bucolo, Wilkins, and Griffin appears to be a complete *denial* of medical treatment, their conduct is sufficient to give rise to a deliberate indifference claim even if viewed as a *delay* in medical treatment. Here, despite the alleged efforts of Roessel, Bucolo,

Wilkins, and Griffin to completely deny Plaintiff any medical treatment, Russo intervened one day after Plaintiff's rectal suffering began, and Plaintiff was brought to a hospital where surgery was performed.  Though it is a relatively short delay of treatment—*i.e.*, somewhere between one and two days—Plaintiff experienced extreme pain during the delay and accordingly Plaintiff has satisfied the objective prong even if viewed through the lens of a delay of treatment.  *See, e.g.*, *Carno v. United States*, 2019 WL 2287966 (finding objective prong satisfied where plaintiff alleged a one-day delay in bringing him to the emergency room when "he was burned and bleeding out his rear end, so much so that the second corrections officer was 'sickened at the sight of the skin and bleeding almost to the point of nausea'" and claimed to have "suffered excruciating pain during the night before he went to the emergency room.").

The subjective prong is also satisfied here.  After being told that Plaintiff had an object painfully forced into his rectum, Defendant Bucolo advised Plaintiff that "he knew all about it but he was" denying Plaintiff access to medical treatment pursuant to "the orders of his bosses Superintendent Griffin and Deputy Wilkins" who "both told him if I said that officers had anything to do with this attack I would be . . . denied all access to medical unit until I said it was inmate related." (Am. Compl. at 38-39.)  Likewise, Plaintiff alleges that Defendant Roessel admitted him into a mental health treatment ward despite being aware of his medical emergency, and that Plaintiff was forced to painfully expel the foreign objects without any medical intervention.  There can be little dispute that Defendant Roessel, Bucolo, Wilkins, and Griffin were subjectively aware of the risk of harm to Plaintiff as both Roessel and Bucolo are alleged to have been advised about the presence of foreign objects in his rectum and saw him bleeding, and Bucolo allegedly relayed this information to Wilkins and Griffin.

26

Accordingly, Defendant's motion to dismiss Plaintiff's claims of deliberate indifference against Defendant Roessel, Wilkins, Griffin, and Bucolo is DENIED in light of their apparent failure to obtain (or delay in obtaining) medical treatment to address the foreign objects painfully lodged in Plaintiff's rectum.

D.   *Denial of Appropriate Mental Health Treatment In Connection With Plaintiff's Suicide Attempts in Spring 2016*

In inmate suicide cases, deliberate indifference arises "under one of two broad fact situations." *Rellergert v. Cape Girardeau County*, 924 F.2d 794, 796 (8th Cir. 1991). "First is a suicide or attempt that occurs when jailers failed to discover the decedent's suicidal tendencies. Second is a suicide or attempt that occurs when jailers have discovered the tendencies and have taken preventive measures." *Id.* (footnote omitted); *see also Kelsey v. City of New York*, No. 03-CV-5978, 2006 WL 3725543, at *5 (E.D.N.Y. Dec. 18, 2006) (same), *aff'd*, 306 F. App'x 700 (2d Cir. 2009). In cases involving attempted suicide, deliberate indifference requires "a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide; and (2) intentionally disregarded that risk." *See Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006).

Here, DOCCS Defendants do not dispute that Plaintiff has adequately alleged a claim for deliberate indifference based upon his claim that Defendant Barter discharged him from the RTCP despite Plaintiff's protestation that he was contemplating suicide after being raped. Nonetheless, DOCCS Defendants do not address Plaintiff's allegation that others were involved in the determination to discharge him from the RTCP and were aware of his suicidal mental state based on his prior history of multiple suicide attempts and his contemporaneous statements that he was suicidal. As alleged, Defendants Griffin and Wilkins personally visited him told him that he would be discharged from the RTCP despite his suicidal ideation. Likewise, Defendant Annucci is

27

alleged to have led the efforts to discharge Plaintiff from the RTCP despite Plaintiff's suicidal ideation. "While the amended complaint lacks facts related to when [Defendant Annucci's order to discharge Plaintiff from RTCP] occurred, the Court cannot say that these allegations, if true, and with all reasonable inferences drawn in Plaintiff's favor, do not amount to deliberate indifference." *Randolph v. Kalies*, No. 919CV1161DNHTWD, 2021 WL 396441, at *6 (N.D.N.Y. Jan. 19, 2021), *report and recommendation adopted*, No. 9:19-CV-1161, 2021 WL 392488 (N.D.N.Y. Feb. 4, 2021); *see also Thomas v. Ashcroft*, 470 F.3d 491, 497 (2d Cir. 2006) (reversing the dismissal of a prisoner's complaint that sufficiently alleged that defendants ignored his serious medical needs despite being made aware of them).

      E.    *Denial of Medical Care in Connection with September 5, 2016 Rape*

Liberally construed, Plaintiff alleges that Defendants Bentivegna and Cody were deliberately indifferent to a sufficiently severe medical condition by failing to either provide or obtain any medical assistance for Plaintiff's apparent rectal injuries in or around September 5, 2016. As alleged, Defendant Cody walked into Plaintiff's room several hours after an alleged violent rape occurred, saw blood, was advised about the events that had occurred (*e.g.*, that he had been violently raped and had a metal rod in his rectum), took Plaintiff's vitals and told him there was nothing else she could do. Defendant Bentivegna is alleged to have arrived in Plaintiff's room sometime later after an unidentified nurse called Plaintiff's bleeding to his attention, refused to provide Plaintiff with any treatment, was advised that a metal object remained lodged in Plaintiff's rectum, refused to provide any medical treatment at the prison clinic or to send Plaintiff to an outside specialist, and as a result the metal object remained in Plaintiff's rectum for one-week and caused permanent damage.

Oddly, DOCCS Defendants take the position that Plaintiff has not alleged a deliberate indifference claim against Bentivegna because "Plaintiff is not constitutionally entitled to

treatment at an outside hospital" where he has already "receive[d] care at the prison clinic." (DOCCS Mem. at 11.)  It is true that Plaintiff complains about Dr. Bentivegna's failure to send Plaintiff to an outside rectal specialist and that those allegations lack sufficient detail regarding the necessity of an outside specialist to plausibly plead a claim for deliberate indifference *on that theory*.  Nonetheless, Plaintiff also complains that he received no treatment *whatsoever* from either Bentivegna or Cody after he profusely bled from his rectum and advised them that he had a metal objected in his rectum and that, due to the lack of treatment, a metal rod remained lodged in his rectum for one week and he suffered permanent rectal injuries.  Those allegations are more than sufficient to state a claim for deliberate indifference as against Cody and Bentivegna.

Accordingly, DOCCS Defendants' motion to dismiss is DENIED with respect to Bentivegna and Cody with respect to their failure to treat his severe rectal injuries resulting in permanent damage in or around September 5, 2016.

*       *       *

In sum, DOCCS Defendants' motion to dismiss with respect to Plaintiff deliberate indifference claims are GRANTED in part, and DENIED in part.  Plaintiff's deliberate indifference claims against Defendants Dr. Ruvo, Blot, Sudranski, Kahyaoglu, Gleason, and Karuchee with respect to treatment after the December 29, 2015 assault are dismissed without prejudice.  DOCCS Defendants' motion to dismiss is DENIED with respect to deliberate indifference claims asserted against Defendants Griffin, Wilkins, Annucci, Roessel, Bucolo, Bentivegna, and Cody arising from the events of February 28, 2016 through September 5, 2016.

## III.    Failure to Protect

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody."  *Hayes v. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 831 (1994)).  This requirement includes a general "duty

. . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833. Similarly, liability will arise for a prison official's failure to protect or intervene where he observes a fellow official using excessive force or has reason to know that excessive force will be used. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001).

However, not "every injury suffered by [a] prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Prison officials can be held responsible for such harms only if they act with "deliberate indifference" to inmate safety. *Hayes*, 84 F.3d at 620. The test for establishing deliberate indifference to inmate safety has an objective component and subjective component. First, under the objective prong, plaintiffs must show that they were "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Second, under the subjective prong, plaintiffs must establish that the prison official acted with a "sufficiently culpable state of mind." *Id.*

To evaluate culpability under an Eighth Amendment deliberate indifference framework, a prison official must know that the plaintiff "face[d] a substantial risk of harm and he [or she] disregard[ed] that risk by failing to take reasonable measures to abate the harm." *Hayes*, 84 F.3d at 620 (citing *Farmer*, 511 U.S. at 842, 845). The prison official need not be "aware[ ] of the specific risk to the plaintiff or from the assailant." *Warren v. Goord*, 579 F. Supp. 2d 488, 495 (S.D.N.Y. 2008). Rather, the risk may come from a "single source or multiple sources" and may be a risk that all prisoners in the plaintiff's position face. *Id.* (quoting *Farmer*, 511 U.S. at 843).

Here, Plaintiff fails to allege that he informed any Defendant about a specific fear of assault prior to the events of December 29, 2015 or that any prison official was otherwise aware of a risk to Plaintiff. Accordingly, DOCCS Defendants are correct that Plaintiff has not stated a failure to

30

protect claim as against any Defendants with respect to their conduct prior to the December 29, 2015 sexual assault. Similarly, Plaintiff has not asserted sufficient allegations regarding what Defendant Wilkins knew about threats of harm to Plaintiff. Instead, Superintendent Griffin is alleged to be related to a correctional officer that Plaintiff was prepared to testify against and perhaps this is meant to suggest that Superintendent Wilkins was a driving force in a campaign to harass Plaintiff. Regardless of what Plaintiff meant to assert, Plaintiff does not actually allege that Defendant Wilkins was the party directing attacks against Plaintiff and does not even allege whether Defendant Griffin knew anything about a campaign to harass Plaintiff. Likewise, Plaintiff fails to allege that Defendant Wilkins or Pharr were made aware of any particular threats against Plaintiff before those attacks occurred. Instead, he alleges that, after he was assaulted, they acted to stifle investigations into his alleged assaults. Such misconduct is deplorable but does not speak to whether those Defendants had any reason to conclude that Plaintiff was at prospective risk of harm from foreseeable future attacks. Accordingly, Plaintiff has failed to state a failure to protect claim as against Defendants Griffin, Wilkins, or Pharr.

Nonetheless, Plaintiff has asserted adequate allegations to support failure to protect claims against certain Defendants given his assertions that he specifically warned certain DOCCS officials about foreseeable threats to his safety. Plaintiff has clearly alleged that he made certain DOCCS Defendants aware of his specific fear that multiple sources of violence posed a risk to him. *First*, Plaintiff's alleges that, after December 29, 2015 and before the February 28, 2016, he made Defendant Annucci aware of a specific threat of further sexual violence at the hands of correctional officers at Green Haven that wanted him to recant testimony. Critically, he recounts that he "made Commission Annucci and others specifically aware of [Defendant Blot's] threats [*i.e.*, Blot's statement that he would make sure Plaintiff was subjected to further sexual violence if

he did not retract his testimony] and attempted to be moved to a safer prison location." (Am. Compl. at 33.) Despite being aware of this threat, Defendant Annucci resolved to refuse to transfer Plaintiff to a facility where correctional officers did not have a vendetta against him and did not implement procedures to mitigate the risk of sexual assault (*e.g.*, 24-hour video surveillance) until after Plaintiff was assaulted a second time. (*Id.* at 46.) *Second*, Plaintiff alleges that sometime prior to the September 5, 2016 rape, Defendant Urracia was aware of "employee contract on [Plaintiff]"—while somewhat unclear, from context it appears that Plaintiff is suggesting that correctional officers at Green Haven were incentivized to attack him in order to get him to recant his testimony—and that Urracia did nothing to prevent the subsequent rape of Plaintiff. (Am. Compl. at 47.) *Third*, Plaintiff alleges that, on September 5, 2016, Defendant Cody was approached by Defendant Johanni (who angrily demanded access to Plaintiff's room off of the safety video order), allowed Defendant Johanni access to Plaintiff without any cameras, did nothing to report these suspicious circumstances to anyone else, and that Defendant Johanni subsequently facilitated the rape of Plaintiff during the period of time he was given off-camera access to Plaintiff's room. (Am. Compl. at 53.)

At the pleading stage, the above allegations are sufficient to state a failure-to-protect claim against Defendants Annucci, Urracia, and Cody. *See Albritton v. Morris*, No. 13-CV-3708, 2016 WL 1267799, at *13 (S.D.N.Y. Mar. 30, 2016) ("[W]hen an inmate informs correction[ ] officers about a specific fear of assault and is then assaulted, this is sufficient to proceed on a claim of failure to protect." (citation and quotation marks omitted)); *see also Johnson*, 2019 WL 4688542, at *16 (denying motion to dismiss on claims where the defendants were alleged to have "prior notice of racial tension in the unit" that spilled over into violence (citation omitted)); *Sheffer v. Fleury*, No. 18-CV-1180, 2019 WL 4463672, at *8 (N.D.N.Y. Sept. 18, 2019) (finding the

plaintiff's allegations sufficient where he told the defendant that he "feared for his safety," even though he did not allege that he specifically feared a sexual assault); *Beckles v. Bennett*, No. 05-CV-2000, 2008 WL 821827, at *18 (S.D.N.Y. Mar. 26, 2008) (explaining that a failure-to-protect claim survived summary judgment because the plaintiff had "presented evidence that he made [the defendant] aware of a specific threat to his safety and that several hours later he was seriously assaulted").

Accordingly, DOCCS Defendants' motion to dismiss with respect to Plaintiff's failure to protect claims is GRANTED in part and DENIED in part. Plaintiff's failure to protect claims against Defendants Wilkins, Griffin, and Pharr are dismissed without prejudice. He is granted leave to amend his complaint to address the deficiencies identified above – *i.e.*, to allege, if tenable, whether, when, and what Defendants Wilkins, Griffin, and Pharr were aware of with respect to the threats against his safety. DOCCS Defendants' motion is DENIED with respect to the failure to protect claims against Defendants Annucci, Urracia, and Cody.

## IV.    Official-Capacity Claims

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) ("The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents . . . that are, effectively, arms of a state."). State officials therefore cannot be sued in their official capacities for retrospective relief, including damages, under Section 1983. *Will*, 491 U.S. at 71. Nonetheless, state officials can be subject to suit in their official capacities for injunctive or other prospective relief. *Id.* at 71 n. 10 ("[O]fficial-capacity actions for prospective relief are not treated as actions against the State."); *Ex parte Young*, 209 U.S. 123 (1908).

33

DOCCS Defendants, are employed by the State of New York, and thus damages are available against them in their official capacities only to the extent that damages would be available against the State.  "[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity."  *Gollomp*, 568 F.3d at 366.  "New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting Section 1983."  *Al Javier v. Russo, et al.*, No. 21-CV-7097 (LTS), 2021 WL 4252061, at *5 (S.D.N.Y. Sept. 17, 2021) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977)).

"[I]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254, 131 S.Ct. 1632, 179 L.Ed.2d 675 (2011) (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002)).

Plaintiff's claim for money damages pursuant to Section 1983 is retrospective, as it seeks damages for past conduct and is therefore barred by the Eleventh Amendment.  *See Hauff v. State Univ. of N.Y.*, 425 F. Supp. 3d 116, 128 (E.D.N.Y. 2019) ("New York State has not waived its Eleventh Amendment immunity and consented to suit in federal court under the NYSHRL."); *Roniger v. McCall*, 22 F. Supp. 2d 156, 161 (S.D.N.Y. 1998) ("Money damages are available under § 1983 only in suits brought against officials in their personal capacities, since money damages against a state are barred by the Eleventh Amendment.") (citations omitted); *Fedele v. Harris*, 69 F. Supp. 3d 313, 318-19 (N.D.N.Y. 2014) ("Suits for damages arising under 42 U.S.C. § 1983 are

barred by the Eleventh Amendment unless the state has specifically waived its immunity."); *Mamot v. Bd. of Regents*, 367 F. App'x. 191, 192 (2d Cir. 2010) ("It is well-established that New York has not consented to § 1983 suits in federal court, and that § 1983 was not intended to override a state's sovereign immunity."); *see also Will*, 491 U.S. at 66.

Plaintiff separately seeks prospective injunctive relief in the form of an order that all DOCCS Defendants remain 700 feet away from Plaintiff during the pendency of the litigation and that all sexual assault reports that are staff related are overseen by an outside party independent of DOCCS. (Am. Compl. at 63.) With respect to Plaintiff's claim for injunctive relief, Plaintiff does not contend that an ongoing violation of federal laws is occurring. Instead, each of the underlying events giving rise to this action occurred over five years ago at a correctional facility where Plaintiff no longer resides. Accordingly, as pled, Plaintiff's request for injunctive relief is also barred by the Eleventh Amendment. *See, e.g.*, *McKenna v. Dinapoli*, 2016 WL 7413490, * 5 (E.D.N.Y. Dec. 22, 2016) (holding that a request for "a permanent injunction enjoining and restraining the defendants from future retaliation against plaintiff and from future interference with [his] constitutionally protected right to his public pension[,]" is barred by the Eleventh Amendment because it did not allege an ongoing violation of federal law).

## V.   Claims Against Russo

DOCCS Defendants argue that claims against Defendant Russo should be dismissed because the only allegation against her is that she failed to fully investigate Plaintiff's allegations relating to his sexual assault, and failures to investigate do not give rise to colorable constitutional claims where the defendant is not otherwise directly involved in the underlying assault. (DOCCS' Mem. at 12.) Plaintiff responds that "I have no problem with [Russo] being removed from this claim as a Defendant." (Pl's Opp. at 11.)

The Court agrees that "[t]here is . . . no constitutional right to an investigation by government officials," *Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008), and accordingly Plaintiff has not asserted a plausible claim against Defendant Russo. Moreover, Plaintiff described Defendant Russo as repeatedly aiding Plaintiff in obtaining medical assistance and getting protective orders to prevent further abuse. Separately, and in any event, Plaintiff has abandoned his claim against Russo by asserting that he has no problem with Russo being removed from the case and did not intend to name Russo as a Defendant in the first place. Accordingly, the claims against Defendant Russo are dismissed with prejudice.

## VI.   Claims Predicated Upon Violation of PREA

Plaintiff appears to assert violations of PREA as an independent cause of action against various Defendants based on their failure to investigate or report instances of sexual assault described herein. Courts in the Second Circuit have held that there is no private right of action to bring a suit under the PREA. *See Miller v. Annucci*, No. 17-CV-4698, 2019 WL 4688539, at \*10 (S.D.N.Y. Sept. 26, 2019); *McCloud v. Prack*, 55 F. Supp. 3d 478, 482 (W.D.N.Y. 2014); *Green v. Martin*, 224 F. Supp. 3d 154, 170-71 (D. Conn. 2016). While the Second Circuit has not addressed the matter, at least two circuit courts have concluded that PREA does not give rise to a private right of action. *Bowens v. Wetzel*, 674 F. App'x 133, 137 (3rd Cir. 2017) ("Bowens may not attempt to enforce statutes or policies that do not themselves create a private right of action by bootstrapping such standards into a constitutional deliberate indifference claim."); *Krieg v. Steele*, 599 F. App'x 231, 232-33 (5th Cir. 2015) (finding that PREA does not afford a private right of action).

Though deeply offensive, the alleged acts by Defendants in failing to properly report instances of sexual assault in violation of PREA do not give rise to liability. Plaintiff's claims pursuant to PREA are dismissed with prejudice.

36

## VII.     Personal Involvement of Defendants Annunnci

DOCCS Defendants argue that Plaintiff has failed to adequately allege that Defendant Annucci was personally involved in the constitutional violations at issue in this litigation.  As is clear from the above, the Court concludes that Plaintiff has adequately alleged the personal involvement of Defendant Annucci.

"[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because [he or she] held a high position of authority."  *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (affirming a district court's dismissal of claims against a prison warden where plaintiff did not allege the warden's personal involvement in, or awareness of, the health, safety, and communications issues raised by plaintiff); *Walker v. Schriro*, No. 11-CV-9299 (JPO), 2013 WL 1234930, at *15 (S.D.N.Y. Mar. 26, 2013) ("A defendant's status as warden or commissioner of a prison, standing alone, is [ ] insufficient to support a finding of supervisory liability.").  Rather, "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity."  *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (emphasis added) (internal quotation marks omitted).  As the Second Circuit has explained, the personal involvement of a supervisory defendant may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Here, Plaintiff has alleged that Defendant Annucci was informed of the relevant conduct and repeatedly failed to remedy various constitutional violations.  Rather than address Plaintiff's express allegations that Defendant Annucci was aware of a conspiracy to continually harass Plaintiff and deprive him of medical treatment in order to force him to recant his testimony against a well-connected DOCCS official, Defendants ignore these allegations and suggests that the Court can dismiss claims against Defendant Annucci based on the lack of any nonconclusory allegations giving rise to supervisory liability.  (DOCCS' Mem. at 14.)  The Court disagrees that Plaintiff's allegations are conclusory because.  The Court appropriately discounts Plaintiff's overly speculative allegation that, soon after December 29, 2015, Defendant Annucci became aware of the particulars of Plaintiff's plight by conducting an investigation at Green Haven regarding Plaintiff's hunger strike and its underlying motivation (as Plaintiff previously contradicted that allegation).  Nonetheless, Plaintiff otherwise specifically pled what Defendant Annucci knew, when he knew it, and that Defendant Annucci either did not take steps to intervene despite his knowledge of a coordinated effort to harass Plaintiff or was actively leading a conspiracy to harass Plaintiff by directing subordinates to engage in several of the constitutional violations described above.

Accordingly, DOCCS Defendants' motion to dismiss with respect to claims against Commissioner Annucci is DENIED.

## VIII.   Qualified Immunity

The doctrine of qualified immunity gives "officials 'breathing room to make reasonable but mistaken judgments about open legal questions.'"  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866, 198 L. Ed. 2d 290 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)). As such, "qualified immunity shields both state and federal officials from suit unless [1] the official violated a statutory or constitutional right that [2] was clearly established

at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (internal quotation marks omitted).  To determine whether a right was clearly established, the Court looks to: (1) "the specificity with which a right is defined"; (2) the existence of Supreme Court or the applicable circuit court case law on the subject; and (3) whether it was "objectively reasonable" for the defendant to believe the conduct at issue was lawful.  *Id.* at 231; *Gonzalez v. City of Schenectady*, 728 F.3d 149, 161 (2d Cir. 2013).

In this Circuit, "a defendant may [raise qualified immunity in a pre-answer motion to dismiss], but the defense is held to a higher standard than if it were asserted in a motion for summary judgment." *Sledge v. Bernstein*, 2012 U.S. Dist. LEXIS 110701, 2012 WL 4761582, at *4 (S.D.N.Y. Aug. 2, 2012).  "Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (quoting *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992) and citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998)).  "[T]he plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.*  Thus, the qualified immunity defense is "typically addressed at the summary judgment stage," because it "usually depends on the facts of the case, . . . making dismissal at the pleading stage inappropriate." *Woods v. Goord*, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *10 (S.D.N.Y. Apr. 23, 2002) (citing *King v. Simpson*, 189 F.3d 284, 289 (2d Cir. 1999)).

DOCCS Defendants raise two vague arguments as to why unspecified Defendants are entitled to qualified immunity.  First, DOCCS Defendants argue that "reasonable officials in the position of supervisory defendants could have believed that placing Plaintiff in isolation and under

24-hour video surveillance constituted reasonable steps aimed at protecting Plaintiff from future harm." (DOCCS Mem. at 15.)  This argument is wildly unhelpful insofar as DOCCS Defendants never define the term "supervisory defendants" and leave it for the Court to guess as to which of the 21 DOCCS Defendants had reasonably believed that placing Plaintiff in isolation was a reasonable step towards ensuring his protection.  In any event, this argument does not readily apply to Plaintiff's well-pled failure to protect claims.  Defendant Cody allegedly witnessed correctional officers evade the video surveillance in order to abuse Plaintiff and thus could not have reasonably believed that the surveillance was sufficient to protect Plaintiff.  Likewise, DOCCS Defendants appear to misunderstand the chronology of events alleged by Plaintiff.  Defendant Annucci is alleged to have known that Defendant Blot and other Green Haven officers were planning to harass Plaintiff prior to the February 28, 2016 assault, and no video surveillance was introduced until after that attack.  Accordingly, Defendant Annucci cannot be said to have reasonably believed that sufficient measures were in place to protect Plaintiff from harm prior to February 28, 2016.  Finally, while a reasonable official may have initially believed that the installation of 24-hour video surveillance would have been a reasonable step to protect Plaintiff, a reasonable official would have quickly been disabused of this assumption based on the alleged events occurring after the camera was installed.  As alleged, after the video order went into effect, Plaintiff repeatedly attempted suicide and was known to be subject to an "employee contract" by several Defendants.  Accordingly, it was not reasonable for Defendant Urracia to conclude that video surveillance would protect Plaintiff given his alleged knowledge that correctional officers at Green Haven had a "contract" to assault Plaintiff.

DOCCS Defendants also vaguely argue that reasonable officers "could have believed that Plaintiff received adequate and appropriate medical care." (DOCCS Mem. at 15.)  Again, DOCCS

Defendants fail to identify which of the 21 DOCCS Defendants reasonably believed that adequate and appropriate medical care was provided and leave it for the Court to guess as to which Defendants could have formed this position and why it would have been reasonable.  In any event, this argument is not persuasive at this stage of the litigation.  As alleged, DOCCS Defendants believed that Plaintiff was being deprived medical care as a means to punish him and deter him from testifying against correctional officers.  It is hard to imagine a situation where it would have been reasonable for an official to believe that the punitive deprivation of medical care was actually the provision of adequate and appropriate treatment.

Accordingly, the Court finds that, at this stage, there are insufficient facts on the face of the Amended Complaint to support a qualified immunity defense for DOCCS Defendants. DOCCS Defendants' motion to dismiss pursuant to qualified immunity for unspecified Defendants is DENIED.

## CONCLUSION

For the foregoing reasons, Defendants' motions are GRANTED in part and DENIED in part.  The Court dismisses the following claims **with prejudice**: (1) all claims asserting a violation of PREA, (2) all official liability claims predicate seeking money damages, and (3) all claims against Defendant Russo.  The Court dismisses the following claims **without prejudice**: (A) Eighth Amendment deliberate indifference to medical needs claims against Defendants Blot, Karuchee, Gleason, Kahyaoglu, Sudranski, and Dr. Ruvo; (B) Eighth Amendment failure to protect claims against Defendants Griffin, Wilkins, and Pharr; and (C) official liability claims relating to injunctive relief.

Plaintiff is granted leave to replead any claims that were dismissed without prejudice.  He may file a Second Amended Complaint consistent with this Opinion on or before November 29, 2021.  Failure to file a Second Amended Complaint within the time allowed, and without good

cause to excuse such failure, will result in dismissal **with prejudice** of all claims that this Court has dismissed without prejudice in this Opinion.  Plaintiff is further advised that an amendment to a complaint completely supplants the previous complaint.  In other words, he must include all allegations he wishes to be considered in the Second Amended Complaint and if he fails to include any allegations he cannot rely upon the fact that he previously asserted allegations in the Complaint or Amended Complaint.  The Court will not be consolidating multiple complaints.  A Second Amended prisoner civil rights complaint for is attached to this Opinion.

The surviving claims are: (1) First Amendment retaliation claims against Defendants Blot, Karuchee, Gleason, and Kahyaoglu; (2) Eighth Amendment excessive force claims against Defendants Blot, Kelly, Dillon, Roggers, Johanni, and Freeman; (3) Eighth Amendment deliberate indifference to medical needs claims against Defendants Barter, Griffin, Wilkins, Annucci, Roessel, Bucolo, Bentivegna, and Cody; and (4) Eighth Amendment failure to protect claims against Defendants Defendants Annucci, Urracia, and Cody.

If Plaintiff does not file a Second Amended Complaint, remaining DOCCS Defendants are directed to file an answer to the Amended Complaint on or before December 29, 2021.  The parties are directed to confer, complete, and submit to the Court the attached Case Management Plan and Scheduling Order on or before October 13, 2021 (template attached).

The Clerk of the Court is kindly directed to terminate the motions at ECF Nos. 104 and 107.  The Clerk of the Court is further directed to mail a copy of this Opinion & Order to pro se Plaintiff at his address listed on ECF.


Dated: September 28, 2021                              SO ORDERED:
       White Plains, New York

_____
        NELSON S. ROMÁN
     United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

\_\_\_\_\_CV_____

_____
Write the full name of each plaintiff.

(Include case number if one has been assigned)

-against-

**SECOND
AMENDED
COMPLAINT**

_____

_____

_____

Do you want a jury trial?
☐ Yes   ☐ No

_____
Write the full name of each defendant. If you need more
space, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of
names. The names listed above must be identical to those
contained in Section II.

---

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore *not* contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include *only*: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☐   **Federal Question**

☐   **Diversity of Citizenship**

## A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

_____

_____

_____

_____

## B.   If you checked Diversity of Citizenship

### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , _____ , is a citizen of the State of
               (Plaintiff's name)

_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
                 (Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____.

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____.

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II. PARTIES

### A. Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

_____

First Name             Middle Initial       Last Name

_____

Street Address

_____

County, City                   State            Zip Code

_____

Telephone Number            Email Address (if available)

Page 3

## B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

First Name                              Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                                    State                        Zip Code

Defendant 2:

First Name                              Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                                    State                        Zip Code

Defendant 3:

First Name                              Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                                    State                        Zip Code

Defendant 4:

_____

First Name                          Last Name

_____

Current Job Title (or other identifying information)

_____

Current Work Address (or other address where defendant may be served)

_____

County, City                        State              Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

### FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

_____

_____

_____

_____

## IV. RELIEF

State briefly what money damages or other relief you want the court to order.

_____

_____

_____

_____

_____

## V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| | |
|---|---|
| Dated | Plaintiff's Signature |

| | | |
|---|---|---|
| First Name | Middle Initial | Last Name |

Street Address

| | | |
|---|---|---|
| County, City | State | Zip Code |

| | |
|---|---|
| Telephone Number | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☐ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

UNITED STATES DISTRICT COURT                                    Rev. Jan. 2012
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

                                                    **CIVIL CASE DISCOVERY PLAN**
                              Plaintiff(s),          **AND SCHEDULING ORDER**

        - against -


                              Defendant(s).       _____ CV _____ (NSR)


-------------------------------------------------------------x

  This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel,
pursuant to Fed. R. Civ. P. 16 and 26(f):

1.      All parties [consent] [do not consent] to conducting all further proceedings before a
        Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c).  The parties
        are free to withhold consent without adverse substantive consequences.  (If all parties
        consent, the remaining paragraphs of this form need not be completed.)

2.      This case [is] [is not] to be tried to a jury.

3.      Joinder of additional parties must be accomplished by _____.

4.      Amended pleadings may be filed until _____.

5.      Interrogatories shall be served no later than _____, and responses thereto
        shall be served within thirty (30) days thereafter.  The provisions of Local Civil Rule 33.3
        [shall] [shall not] apply to this case.

6.      First request for production of documents, if any, shall be served no later than
        _____.

7.      Non-expert depositions shall be completed by _____.

        a.      Unless counsel agree otherwise or the Court so orders, depositions shall not be held
                until all parties have responded to any first requests for production of documents.

        b.      Depositions shall proceed concurrently.

        c.      Whenever possible, unless counsel agree otherwise or the Court so orders, non-party
                depositions shall follow party depositions.

8.      Any further interrogatories, including expert interrogatories, shall be served no later than
_____.

9.      Requests to Admit, if any, shall be served no later than _____.

10.     Expert reports shall be served no later than _____.

11.     Rebuttal expert reports shall be served no later than _____.

12.     Expert depositions shall be completed by _____.

13.     Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14.     **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15.     Any motions shall be filed in accordance with the Court's Individual Practices.

16.     This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of
Court (or the assigned Magistrate Judge acting under a specific order of reference).

17.     The Magistrate Judge assigned to this case is the Hon. _____.

18.     If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the
Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this
Order consistent therewith.

19.     The next case management conference is scheduled for _____, at
_____. (The Court will set this date at the initial conference.)


SO ORDERED.

Dated:   White Plains, New York
        _____


        _____
        Nelson S. Román, U.S. District Judge